UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | | |
|---|---|---|
| ALPHA ALPHA CHAPTER OF ZETA BETA TAU FRATERNITY, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Cause No. 4:23-CV-074-PPS-JEM |
| BRANDON CUTLER, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before me on Defendants' motion to dismiss Plaintiffs' injunctive relief claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. [DE 9; *see* DE 10; DE 21; DE 24.] The Zeta Beta Tau fraternity, and its local chapter on the campus of Purdue University (and five of its members), brought this action against the University seeking injunctive relief to address alleged violations of their rights in the course of two disciplinary proceedings before Purdue's Interfraternity Council Judicial Board in April and November 2023. The operative complaint is a bit messy; it asserts an array of both federal and state law claims against the University and various individuals who work there. [*See* DE 44 (FAC).]

Defendants assert that the University and its officials are immune from the injunctive relief claims under the Eleventh Amendment and seek dismissal for lack of subject matter jurisdiction. [DE 9 at 3–4.] In sum, Plaintiffs concede that their claims against Purdue University are barred by Eleventh Amendment immunity and the claims against the University will therefore be dismissed without prejudice. Plaintiffs'

state law claims seeking injunctive relief from Purdue and the individual defendants in their official capacities will also be dismissed without prejudice under the doctrine of sovereign immunity. However, Plaintiffs will be permitted to proceed on their injunctive claims against the individual defendants in their official capacities asserting violations of federal law, as those claims fall within the exception to sovereign immunity recognized in *Ex Parte Young*, 209 U.S. 123 (1908).

**Procedural Background**

Plaintiffs' initial complaint sought injunctive relief in connection with a disciplinary hearing against ZBT in April 2023 and a "cease and desist" order that was issued on April 25, 2023, following the hearing. [DE 1.] Plaintiffs simultaneously moved for entry of a temporary restraining order [DE 3], purportedly to "maintain the status quo" between the parties in the pendency of this action.

I held a prompt hearing on Plaintiff's request for a TRO and denied the motion on the record. I concluded that Plaintiffs failed to demonstrate irreparable harm in the absence of immediate injunctive relief or that they lacked an adequate remedy at law justifying such an extraordinary remedy. I noted that over four months had passed between the disciplinary hearing forming the heart of the claims and Plaintiffs' request for an injunction. Plaintiffs asserted that in the absence of a TRO, they would be unable to engage in "unrestricted activities and events pending the resolution of this litigation," such as Purdue's fall fraternity recruitment period and scheduled philanthropic events, which potentially placed in jeopardy the chapter's status as a

registered student organization. [DE 3 at 12.] That said, Plaintiffs also acknowledged that the fraternity remained a registered student organization and was not categorically barred from participating in these events under the terms of the April 25 cease and desist order. And in any case, Plaintiffs had not sought to enjoin the discipline handed down some four months earlier, which substantially undermined their position that any harm stemming from that stale disciplinary process was irreparable in the absence of a TRO.

In sum, because Plaintiffs failed to demonstrate irreparable injury or a lack of an adequate remedy at law, I denied the motion as to the request for a TRO. But I set a briefing schedule on the motion for a preliminary injunction. The parties submitted briefs [DE 26; DE 30] and after a lengthy continuance occasioned by a medical emergency impacting Plaintiffs' counsel and the Court's congested calender [DE 32; DE 33; DE 34], an evidentiary hearing on that motion was held January 31, 2024. [DE 41; DE 42; DE 43; DE 45.] Following the evidentiary hearing, I ordered the parties to submit post-hearing briefs on or before March 8. [DE 41.]

Ahead of the preliminary injunction hearing, Plaintiffs moved to supplement their complaint with additional factual allegations pertaining to a second disciplinary hearing that was held in November 2023; plaintiffs sought to add a cause of action under § 1983 for alleged deprivations of Plaintiffs' constitutional rights to due process and freedom of association. [DE 37; DE 37-1.] Defendants opposed the motion; it was ripe and pending when the parties presented argument at the evidentiary hearing.

[DE 38; DE 39.] I granted the motion on the record [DE 41], and the now-operative amended complaint was filed a few days later. [DE 44]. To avoid any undue delay, and because the amendment did not moot the arguments raised in Defendants' pending motion to dismiss, I told the parties that I would construe the motion to apply to Plaintiffs' amended complaint.

With that procedural history in mind, let's turn to the allegations of the amended complaint. [DE 44.]

**Facts**

As prefaced, this case centers on two disciplinary proceedings against ZBT held before the Interfraternity Council's Judicial Board on April 12, 2023 and November 14, 2023. The first stemmed from a "registered function" at the frat house on the evening of January 27 and morning of January 28, 2023. The second stemmed from a separate get-together involving "borgs" on the fraternity's front lawn in mid-April 2023. Being 61 years old and four decades removed from college, I was surprised to learn at the evidentiary hearing that the term "borg" is short for a "blackout rage gallon," which is apparently a trend at certain universities. A "borg" is formed by "taking a gallon jug of water, emptying it a bit to fit in [a] desired amount of alcohol and adding in some sort of flavoring like water-enhancing drops or powdered drink mixes. The hashtag #borg has garnered more than 74.7 million views on TikTok."[1]

---

[1] *See* CBS News, *What's a borg? The latest college drinking trend, explained* (Mar. 7, 2023), available at https://www.cbsnews.com/news/whats-a-borg-college-drinking-trend-explained/.

4

Anyway, in between the two hearings, on April 25, 2023, the fraternity received a cease and desist letter, issued by Noah Berning (who I understand was a student at the University and served as IFC's President at the time), in connection with the second investigation. Plaintiffs tell me that in the course of both disciplinary proceedings, the University and its officials dispensed a brand of rough justice that denied them due process.

Purdue is a public university in Indiana. As with most large bureaucracies, Purdue has a menagerie of various offices beset with acronyms, so bear with me while I set the stage. First, Purdue has an office called Fraternity, Sorority, and Cooperative Life (FSCL) that oversees student groups, including fraternities like ZBT. FSCL shares responsibility overseeing student discipline with Purdue's Office of Student Rights and Responsibilities (OSRR). Specifically, Plaintiffs claim FSCL and OSRR share responsibility for deciding what matters may be heard by the IFC Judicial Board. OSRR conducts investigations on disciplinary matters and presents its findings to the IFC Judicial Board when adjudication authority is delegated to the IFC Judicial Board. [DE 44 (FAC), ¶¶ 13–15.]

Purdue as an entity can, of course, only act through its agents. So in addition to suing Purdue, Plaintiffs have also filed suit against pretty much every individual conceivably involved in the disciplinary process: Brandon Cutler (Director of FSCL), Abigail Lynn Howard (Associate Director of FSCL and "primary advisor" to the IFC), Jeffrey Stefancic (Director of OSRR), Margaret Reisdorf (Associate Director of OSRR),

Amanda Palmer (Student Affairs Specialist, OSRR), Dr. Katherine Sermersheim (Dean of Students, to whom OSRR and FSCL offices report), and Beth McCuskey (Vice Provost for Student Life, to whom Dr. Sermersheim reports). All of these folks are sued "in [their] individual and official capaciti[es]." *Id.,* ¶¶ 14, 16–21.

Palmer was the person who allegedly prepared the investigation report presented by Stefancic at the hearing, including interviewing witnesses "whose identities were kept secret." Reisdorf allegedly denied ZBT representatives access to information relied upon in issuing the April 25th cease and desist letter. As for Sermersheim and McCuskey, they don't appear to have played any role in the investigation, resulting sanctions, or issuance of the cease and desist letter, beyond serving as high-ranking members of the University to whom the balance of the individual defendants reported.

Before getting into the gist of the claims, let's start with some background on the murky world of student discipline at Purdue University. The University's Bill of Student Rights states that students and student organizations have "the right to substantive and procedural fair play in the administration of discipline," which "requires that in all situations the student be informed of the nature of the charges, that the student be given an opportunity to refute them and that the institution not be arbitrary in its actions." [FAC, ¶ 26.] OSRR publishes regulations about how the University processes charges: there is the right to be informed in writing of discipline charges, the right to a fair conduct conference, the right to be informed of the names

and addresses of witnesses known to OSRR, the right to be fairly informed of the reported circumstances of any alleged violation, and the right to appeal. *Id.*, ¶ 31.

The IFC Judicial Board is a student-run operation and may be granted jurisdiction over incidents and handle conduct hearings, but only with OSRR's permission. *Id.*, ¶ 32. All chapters of a North American Interfraternity Conference, including ZBT, are required to hold membership in the IFC. *Id.*, ¶¶ 28–30. The IFC Judicial Board's bylaws, which Plaintiffs claim are approved by the University or its officials, guarantee that witnesses may be called in for questioning and examined (and cross-examined) by each party during disciplinary proceedings. *Id.*, ¶¶ 33–34. The IFC Judicial Board may impose "serious sanctions" on a fraternal member group only with the approval of the Dean of Students or a designee of the Dean of Students. *Id.*, ¶ 35. The Dean or her assignee may not agree with the sanctions, in which case the Board must reconsider them; if they cannot come to an agreement, the Vice Provost for Student Life makes the final call. *Id.*, ¶¶ 36–37.

With that backdrop, let's get into what brought us here. In accordance with the University's Safety and Risk Management Authority procedures, on January 27, 2023, two inspections of the chapter house were conducted by members of the IFC. Plaintiffs claim that no violations were found as a result of either random inspection. [FAC, ¶ 40.] But they further allege that reports from the two inspections were "altered" by another IFC representative, who had not been present during either of the inspections, to reflect that ZBT had violated safety rules. *Id.*, ¶ 41. The reports are not in the record. For

present purposes, I'll credit the veracity of Plaintiff's allegation that they were doctored by an unidentified IFC representative who is not named as a defendant to the action.

An investigation was conducted into the presence of alcohol at the function in question. *Id.*, ¶ 42. The investigation resulted in multiple charges of violations against the chapter. *Id.*, ¶ 44. During the course of the investigation, "Purdue" (presumably through its officials, but none are identified as having done this) allegedly refused to allow the chapter's representatives to review evidence in the University's possession. *Id.*, ¶ 43. Plaintiffs also complain that: (a) although they were allowed "to look at some documents," they could not make copies; (b) they were not allowed to obtain personal copies of documents related to the investigation, including the investigation report, prior to the disciplinary hearing; (c) they were denied the right to have a lawyer present at the hearing; and (d) no witnesses were identified to them before or during the hearing. *Id.*, ¶ 45–49. Plaintiffs also take issue with OSRR's preparation of an investigation report that was presented at the April hearing. They claim it was prepared by Palmer (the Student Affairs Specialist with OSRR), approved by Stefancic (the Director of OSSR), and approved to be presented to the IFC Judicial Board by Cutler and Howard. [FAC, ¶ 50.] The report allegedly contained false or misleading information, did not name any witnesses (their names were redacted), and did not contain any specific facts Plaintiffs believe justified imposition of sanctions against the chapter. *Id.*, ¶¶ 51–52.

The IFC Judicial Board held its hearing on April 12, 2023. Plaintiffs paint a picture of a kangaroo court designed to convict them of the charges by any means. They have several grievances with the hearing. First, they complain about who was allowed in the hearing room, in violation of IFC rules. [FAC, ¶¶ 53–56.] Plaintiffs also claim that during the hearing, the IFC's Chief Justice (with Cutler's approval) called an officer of the IFC, who acknowledged that he received and then altered the safety reports some time after the January function. *Id.*, ¶ 57.  While Cutler knew that the safety reports "were altered," he nevertheless "allowed the fabricated evidence to form part of the basis of the hearing decision." *Id.*, ¶ 58.

At the hearing, nobody was able to identify any firsthand witnesses to the alleged violations. *Id.*, ¶ 59. The only "testimony" against the chapter was the redacted investigation report, which was read into the record by the IFC Prosecutor. *Id.*, ¶ 60. Because there were no witnesses, Plaintiffs assert that they were deprived of the ability to cross-examine witnesses to the alleged violations. *Id.*, ¶¶ 62–63. In addition, Plaintiffs were unable to record the hearing themselves, even though it was recorded using University equipment. [FAC, ¶ 64.] They made requests for a transcript but were rebuffed. *Id.* at ¶¶ 65–66. This hamstrung their appeal efforts. *Id.*, ¶ 67. Based on the foregoing facts, Plaintiffs claim that the University and its officials violated their rights to due process. *Id.*, ¶¶ 68–70.

Following the hearing, a decision was issued (any documentation of which has been omitted from the pleadings). The decision imposed sanctions including fines and

limitations on ZBT's "ability to engage in regular social events" – whatever that means. [FAC, ¶ 72.] Plaintiffs tell me that it amounts to "a prior restraint on the Chapter's associational rights," and that it violated their rights to due process and equal protection to boot. *Id.*, ¶¶ 71–74. They also tell me that it "constituted a breach of contract" – but I have no idea what "contract" they are referencing. *Id.*, ¶ 71. In essence, these allegations are legal conclusions fixed onto the facts with little regard for how the facts connect to Plaintiffs' discrete (in fact, scattershot) causes of action.

Plaintiffs then sought an appeal of the April decision and sanctions. *Id.*, ¶ 75. The IFC Executive Board reviewed the appeal, which was made without the benefit of a hearing transcript, over Plaintiffs objection, and affirmed the IFC Judicial Board's decision and sanctions. *Id.*, ¶¶ 76–78. Following the appeal, FSCL posted a ranking of the chapter, which listed it as having a "Level 3 Conduct reporting," while Plaintiffs contend the decision and imposition of sanctions only supported a "Level 2" conduct ranking. *Id.*, ¶ 82. It's a little unclear what difference that makes, but one may infer that a higher level of conduct reporting means the underlying violations were more serious in nature or require additional findings of responsibility than a lower level of conduct reporting. Plaintiffs take issue with the posting of more serious sanctions than were warranted as a result of the decision because "having more serious sanctions impairs and discourages the recruitment of new members by the Chapter." *Id.*, ¶ 83.

The second investigation complained of by the Plaintiffs kicked off with a cease and desist letter issued to the fraternity by IFC on April 25, 2023. [DE 44-1.] The letter

provided the fraternity "official notification" of a decision rendered by the IFC to "place all chapter social events and activities on immediate cease and desist." *Id.* That means that "activities including chapter social events or any events with alcohol must be immediately and indefinitely suspended." *Id.* However, chapter "operations including executive board and chapter meetings, new member activities and recruitment, and intramurals *may still proceed*," provided a chapter advisor or fraternity headquarters representative is "present at all new member activities and recruitment." *Id.* (emphasis added). The cease and desist letter says that it remains in effect "indefinitely," *see id.*, but as explained in the rest of the complaint, it was simply the start of another disciplinary process that has since resolved in a separate set of sanctions issued against ZBT.

Plaintiffs claim that the cease and desist letter itself violated their rights under state and federal law. They claim that it initially came as a surprise and that they could not know what the letter related to or how long the "cease and desist" directive would remain in place. In context, that seems ridiculous. The letter plainly states that it relates an incident that took place at the fraternity "*during the week of Grand Prix*," and that it therefore had nothing to do with the prior disciplinary hearing stemming from the January incident. Publicly available information (https://www.purduegrandprix.org/) reflects that the Purdue Grand Prix, the "Greatest Spectacle in College Racing," takes place each year in April. In 2023, the 66th anniversary was held on April 21 and 22. While at the time they filed the original complaint (some four months after receiving the

11

letter), Plaintiffs claim they had no clue why the letter was issued, it now seems like everybody understands the letter "was issued following a separate alleged incident," namely the gathering that took place the week of the Purdue Grand Prix. [*See* DE 37; DE 44, ¶ 143 (referencing an "informal gathering" held April 15, 2023, shortly after the April 12, 2023 hearing).]

Aside from Plaintiffs' claims in connection with the cease and desist letter, their Amended Complaint asserts "violations" in connection with the second disciplinary hearing and sanctions that followed. [DE 44, ¶¶ 123–47.] The hearing was initially delayed due to a public records request and eventually held on November 14, 2023. *Id.*, ¶ 126. Plaintiffs have several issues with the hearing procedure. First, they claim they asked to have counsel and a court reporter present at the hearing but both requests were denied. *Id.*, ¶¶ 127–29, 139. They further claim that no witnesses appeared at the hearing and the only evidence presented by IFC's student prosecutor consisted of a photo and two "very short videos." *Id.*, ¶ 131. Plaintiffs also take issue with the student prosecutor, Alex Hardin, refusing to disclose the source of the photo and videos and the IFC "Chief Justice" taking the position that the Family Educational Rights and Privacy Act (FERPA) requires the information to remain confidential in the context of the proceeding. *Id.*, ¶¶ 132–33. Finally, Plaintiffs assert that Hardin was allowed to improperly offer "his personal commentary" on what the photos reflected as evidence against the fraternity and conceded that there was no "physical evidence" that there was alcohol on the fraternity's front porch. *Id.*, ¶¶ 134–38.

Following the hearing, ZBT was found responsible for the alleged violations. [FAC, ¶¶ 142–43.] In Plaintiffs' view, the sanctions issued against the fraternity were "more severe than warranted." *Id.* ZBT appealed the decision and sanctions and the appeal was denied December 14, 2023. *Id.*, ¶ 147.

Based on the foregoing facts, the complaint asserts an array of legal claims. As relief, Plaintiffs seek an injunction and, if they prevail, their fees and costs. [FAC at 26–27.] Here's a distillation of the specific claims for relief presented on the face of the complaint:

- Count One is captioned "42 U.S.C. § 1983: Civil Rights Violations," and asserted against "Purdue and its officials." [FAC, ¶¶ 23–147.]

- Count Two, asserted against all "Defendants," is captioned "Civil Rights Violations - Indiana Constitution." *Id.*, ¶¶ 148–55.

- Count Three, another § 1983 cause of action asserted against all "Defendants," is specifically captioned "Violations Related to Equal Protection Rights," and challenges "Purdue's regulations . . . [r]equiring the Chapter to belong to the IFC and face disciplinary hearings only before the IFC Fraternal Judicial Board." *Id.*, ¶¶ 156–63.

- Count Four, for "Violation of Indiana's Public Records Law," is asserted against "Purdue and its officials," like Count One. *Id.*, ¶¶ 164–70.

- Count Five, captioned "Violation of Property Rights," appears to be asserted against a non-party to this action, the "Purdue Interfraternity Council," whose members include various fraternities at the University, including the Purdue chapter of Zeta Beta Tau. *Id.*, ¶¶ 14, 88, 171–75.

- Count Six is for breach of contract against all Defendants, based on Defendants' alleged breach of the University's contract with Plaintiffs and alleged interference with Plaintiffs' rights. *Id.*, ¶¶ 176–82.

- Count Seven, added with the supplemental pleading, is another claim under § 1983 for violations of Plaintiffs' due process and associational

13

rights in connection with Defendants' alleged refusal to provide a copy of the April 12, 2023 hearing transcript and violations of their rights that allegedly took place during the November 14, 2023 hearing. *Id.*, ¶¶ 183–87.

In short, the central focus of this action is obtaining a court order enjoining the University and its officials from engaging in unfair disciplinary processes in connection with the incidents that took place in January and April 2023 (or potentially pursuing discipline against the fraternity and its members in a similar fashion going forward). More specifically, Plaintiffs seek an order:

- Preventing Defendants from enforcing sanctions in connection with the April 12, 2023 or November 14, 2023 disciplinary hearings or enforcing the terms of the cease and desist letter issued by the IFC on April 25, 2023.

- Preventing Defendants from proceeding "with any disciplinary hearing" involving ZBT or its members without: (a) adequate notice and access to charges and evidence which may be used against them and the ability to obtain copies of evidence which may be used against them; (b) identification of witnesses who will testify against them; (c) the ability to have legal counsel "provide guidance" to them; (d) the ability to cross examine adverse witnesses; (e) the right to a "fair and proper hearing"; and (f) the "right to a meaningful appeal."

- Requiring Defendants to remove the decision and sanctions imposed following the April 12, 2023 and November 14, 2023 disciplinary hearings from the fraternity's disciplinary records; and

- Requiring Defendants to comply with Indiana's Access to Public Records Act by providing Plaintiffs a copy of the April 12, 2023 hearing recording.

**Discussion**

Defendants seek dismissal of the injunctive relief claims for lack of jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, asserting their Eleventh Amendment immunity from suit in federal court. "Federal Rule of Civil

14

Procedure 12(b)(1) allows a party to move to dismiss a claim for lack of subject matter jurisdiction." *Hallinan v. Fraternal Ord. of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009); *Estate of Eiteljorg v. Eiteljorg*, 813 F. Supp. 2d 1069, 1073 (S.D. Ind. 2011). In assessing a motion to dismiss under Rule 12(b)(1), I must "accept[] the allegations in the plaintiff's complaint as true and draw[] all reasonable inferences in the plaintiff's favor." *Pena v. Indianapolis Pub. Sch. Corp.*, 2019 WL 2451652, at *3 (S.D. Ind. June 12, 2019) (citing *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999)). To avoid dismissal under the rule, the plaintiff must prove by a preponderance of the evidence that subject-matter jurisdiction is intact. *Id.* (citing *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003)). "[T]he Eleventh Amendment is 'jurisdictional' in the sense that a defendant invoking its sovereign immunity deprives a federal court of jurisdiction over the claims against that defendant." *McHugh v. Illinois Dep't of Transportation*, 55 F.4th 529, 533 (7th Cir. 2022) (citing *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (per curiam)).

Purdue argues that Plaintiffs' claims fail as alleged because Eleventh Amendment immunity bars suits against public universities and claims against state officials in their official capacities. Following its ratification in 1795, the Eleventh Amendment effectively overruled a decision of the Supreme Court, *Chisholm v. Georgia*, 2 U.S. 419 (1793). *Chisholm* had held that a South Carolina citizen could sue the State of Georgia for money damages. That decision caused concern among the states. For decades prior to ratification of the Constitution, states had enjoyed a robust conception of their sovereignty. States figured that the new Constitution had retained traditional

notions of state sovereignty they had enjoyed immediately following the nation's founding, like immunity from suits by citizens for money damages. The Supreme Court in *Chisholm* cast that aside, noting that the original jurisdiction conferred to federal courts under the Constitution was not so limited. Thereafter, states sought and obtained codification of the Eleventh Amendment.

The language of the Eleventh Amendment prohibits suits against a state when they are brought "by Citizens of another State[.]" By its plain terms, the Eleventh Amendment does not apply to suits brought by citizens of one state against their own state. But for murky reasons largely based in history (rather than the actual text of the Amendment), it has been interpreted to apply to *all* suits against states – even those brought by citizens of the same state. It's been that way since the Supreme Court so held back in 1890, despite the plain language to the contrary. *Hans v. Louisiana*, 134 U.S. 1 (1890). In an era of "plain reading" of the Constitution, none of this seems particularly sensible. In all events, that's where we presently stand.

Section 1983 codifies a cause of action for deprivation of constitutional rights ""under color of state law" committed by a "person." A state official sued in his official capacity for money damages is not a "person" within the meaning of § 1983. Such claims against individual defendants in their official capacities are really nothing more than suits against the state.[2] *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)*;*

---

[2] Citing to *Will*, Defendants argue that even if it were not immune to suit under the Eleventh Amendment, Plaintiffs' § 1983 claims should be dismissed under Rule 12(b)(6) for failure to state a claim, since Purdue and its officials acting in their official capacities are not persons under the statute. They have not moved to dismiss on this basis, however.

16

*Kentucky v. Graham*, 473 U.S. 159, 165, 167 (1985). Therefore, § 1983 claims seeking money damages against individual defendants in their official capacities are likewise barred by the Eleventh Amendment. *Power v. Summers*, 226 F.3d 815, 818 (7th Cir. 2000); *see Meadows v. State of Indiana*, 854 F.2d 1068, 1069 (7th Cir. 1988); *Lundeen v. Rhoad*, 991 F. Supp. 2d 1008, 1016–17 (S.D. Ind. 2014).

This is not the first time Purdue has raised Eleventh Amendment immunity as a bar to claims in federal court. In fact, the Seventh Circuit has ruled on point, holding that the Eleventh Amendment bars "all claims against Purdue and [money] damages claims against its officials in their official capacities." *Kashani v. Purdue Univ.*, 813 F.2d 843, 848 (7th Cir. 1987). Plaintiffs do not argue otherwise, conceding that "the Eleventh Amendment bars all claims against a public university, including Purdue University[.]" [DE 21 at 2.] The claims against the University will therefore be dismissed without prejudice for lack of subject matter jurisdiction.

The real issue to unpack is whether any of the claims against the individual defendants can go forward under the doctrine of *Ex Parte Young*, which creates an exception to state sovereign immunity where a suit seeks prospective relief from individual state officials in their official capacities for ongoing violations of federal law. *See Doe v. Purdue Univ.*, 2020 WL 2542674, at *13 (N.D. Ind. May 19, 2020) (citing *Ex Parte Young*, 209 U.S. 123, 159–60 (1908)). For example, in *Kashani*, a student claimed that Purdue and its officials intentionally discriminated against him on the basis of national origin in dismissing him from a doctoral program. The court affirmed dismissal of all

17

claims against Purdue and all claims against the individual defendants for monetary relief. 813 F.2d at 844. However, the plaintiff was allowed to proceed with a § 1983 claim against the officials because he sought prospective relief for continuing violations of his constitutional rights. He sought reinstatement into the program as a remedy. Because the relief sought was "prospective in effect," his claim against the individual defendants in their official capacities fell "outside the prohibitions of the Eleventh Amendment." *Id.* at 848 (quoting *Elliott v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986)). *See also Doe v. Purdue Univ.*, 464 F. Supp. 3d 989, 1009 (N.D. Ind. 2020) (finding claims seeking only injunctive relief against individual defendants in official capacities were "permissible" since official-capacity suits against state officials that seek only injunctive relief are permitted under § 1983 and are not forbidden by the Eleventh Amendment).

The Supreme Court's decision in *Ex Parte Young* was based on the view that a suit seeking prospective relief against a state official acting in his or her official capacity is not a suit against the state because the state cannot authorize its officials to violate federal law. *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 269–70 (1997); *Ex Parte Young*, 209 U.S. at 159–60. Its reasoning is predicated on the Supremacy Clause of the U.S. Constitution, art. VI. *Green v. Mansour*, 474 U.S. 64, 68 (1985); *MCI Telecomm. Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 345 (7th Cir. 2000). As the circuit has explained, "There is a longstanding rationale that underlies this doctrine: "[B]ecause an unconstitutional legislative enactment is 'void,' a state official who enforces that law 'comes into conflict with the superior authority of the Constitution,' and therefore is 'stripped of his official

or representative character and is subjected in his person to the consequences of his individual conduct.'" *Council 31 of the Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012) (quoting *Va. Office for Prot. & Advocacy v. Stewart*, 131 S.Ct. 1632, 1638 (2011)).

Plaintiffs argue that the claims against the individual defendants are "clearly" asserted against them in their official capacities, "not just their individual capacities." [DE 21 at 5.] Because the complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," they argue, the *Ex Parte Young* exception applies and they can seek to enjoin the individual defendants from violating their rights under state and federal law. *See id.* Defendants respond that the exception is "narrow" and does not apply on the face of the complaint or Plaintiffs' motion for a preliminary injunction. [DE 9 at 5.] Defendants seek to avoid application of *Ex Parte Young* on two grounds. *Id.* at 4–6.

First, Defendants argue that some of Plaintiffs' claims are based on state law, so the doctrine is not implicated as to those claims, even assuming without deciding that they seek prospective relief and allege ongoing violations of law. As I touched on above, the *Ex Parte Young* doctrine "rests on the need to promote the vindication of federal rights," while recognizing "the need to promote the supremacy of federal law must be accommodated to the constitutional immunity of the States." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984). Distinguishing between "prospective and retroactive relief fulfills the underlying purpose of *Ex Parte Young* while at the same

time preserving to an important degree the constitutional immunity of the states." 465

U.S. at 106. But the need to reconcile these competing interests "is wholly absent" where

a plaintiff asserts that a state official has "violated *state* law." *Id.*

Following *Pennhurst*, the Seventh Circuit has held the "Eleventh Amendment

immunizes state officers from federal injunctions based on state law." *Cassell v. Snyders*,

990 F.3d 539, 551 (7th Cir. 2021) (citing *Pennhurst*, 465 U.S. at 117). *See also MCI*, 222 F.3d

at 345 n.13 ("The *Ex parte Young* doctrine may not be used to enjoin violations of state

law.") (citing *Pennhurst*, 465 U.S. at 106). Plaintiffs do not identify any authority

suggesting otherwise. Accordingly, their injunctive relief claims against the individual

officers based on state law will be dismissed without prejudice.

Second, Defendants argue that the balance of the claims, while styled as claims

based on violations of Plaintiffs' constitutional rights to due process, freedom of speech,

and equal protection,[3] are really grounded in state law. I am told that Plaintiffs'

"attempt to seed a state law grievance with Fourteenth Amendment elements" does not

bring the claims within the *Ex Parte Young* doctrine. [DE 9 at 6.] The cases Defendants

cite for this proposition do not neatly fit into the facts of this case (indeed, some

involved only money damages claims, which are obviously not applicable here). The

fact remains that Plaintiffs assert these claims under federal law. Defendants seem to

confuse the relevant issue: which is whether Plaintiffs' claims under federal law seek

---

[3] While it's not strictly relevant for present purposes, I'll take a moment to separately note that at the injunction hearing both sides appeared to agree that the gravamen of the complaint is for violation of Plaintiffs' due process rights. The First Amendment claims are essentially window dressing. I'll also note that the concept of equal protection was not mentioned at all during the injunction hearing.

"prospective relief" from the individual defendants in their official capacities for violations of their rights that are "ongoing." *MCI*, 222 F.3d at 345.

As explained in my extensive recitation of Plaintiffs' factual allegations, this suit is about two different investigations and resulting disciplinary proceedings. Because the initial proceeding has been long resolved and the second proceeding was resolved in December, it's fair to ask whether the relief Plaintiffs seek is really prospective, as opposed to retroactive, and whether the alleged violations of their federal rights are still "ongoing." The distinction between prospective and retrospective relief has been described as a "'straightforward inquiry' into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 636 (2002) (quoting *Coeur d'Alene Tribe*, 521 U.S. at 296). As the Supreme Court has recognized, and this matter reflects, "the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night." *Edelman v. Jordan*, 415 U.S. 651, 667 (1974).

While most of the events that form the basis for Plaintiffs' claims in connection with the April 2023 disciplinary process are long past, the ensuing sanctions are "still in place." *See MCI*, 222 F.3d at 345. And through this case, Plaintiffs seek as relief an order enjoining Defendants from enforcing the sanctions and requiring them to remove records of the sanctions from the chapter's disciplinary records. [DE 44 at 26–27.] *Kashani* is one parallel. There, the Seventh Circuit concluded that a claim seeking an

order of reinstatement for a decision to boot a PhD candidate out of a program (allegedly on the impermissible basis of his national origin) could be viewed as seeking prospective relief for an ongoing violation of the plaintiff's civil rights. 813 F.2d at 848. In keeping with that guidance, I find that the relief Plaintiffs seek in connection with the April 2023 and November 2023 disciplinary processes can be fairly characterized as prospective and designed to remedy violations of their federal rights that remain ongoing, despite the resolution of the underlying hearings, sanctions, and appeals.

In sum, Plaintiffs may proceed with their injunctive claims against the individual officers in their official capacities for violations of their rights under federal law. The balance of the claims will be dismissed without prejudice pursuant to Defendants' Eleventh Amendment immunity.

**ACCORDINGLY:**

Defendants' Motion to Dismiss Plaintiffs' Injunctive Relief Claims as Barred by Eleventh Amendment Immunity [DE 9] pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure is **GRANTED IN PART** and **DENIED IN PART**, as follows:

(1) Plaintiffs' claims against Defendant Purdue University are **DISMISSED WITHOUT PREJUDICE**.

(2) Plaintiffs' injunctive relief claims against Defendants based on alleged violations of state law (Counts 2, 4–6) are **DISMISSED WITHOUT PREJUDICE**.

(3) In all other respects, the motion [DE 9] is **DENIED**. Plaintiffs may proceed with their claims under 42 U.S.C. § 1983 seeking injunctive relief against the individual

defendants, Brandon Cutler, Abigail Lynn Howard, Jeffrey Stefancic, Margaret

Reisdorf, Amanda Palmer, Dr. Katherine Sermersheim, and Beth McCuskey, in their

official capacities based on alleged violations of federal law (Counts 1, 3, 7).

**SO ORDERED**.

ENTERED: February 9, 2024.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT