UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

ALPHA ALPHA CHAPTER OF ZETA           )
BETA TAU FRATERNITY, *et al.*,        )
                                       )
      Plaintiffs,                      )
                                       )
      v.                               )          Cause No. 4:23-CV-074-PPS-JEM
                                       )
BRANDON CUTLER, *et al.*,             )
                                       )
      Defendants.                      )

## OPINION AND ORDER

Plaintiffs, Zeta Beta Tau Fraternity at Purdue University and five of its members, have moved for a preliminary injunction against Purdue University and several of its employees, based on alleged deprivations of their constitutional rights in the course of two disciplinary proceedings brought against the fraternity. [DE 3; *see* DE 44 (amended complaint).] Because Plaintiffs have failed to show a likelihood of success on the merits, and for other reasons discussed below, the motion will be denied.

### Procedural Background

Plaintiffs' initial complaint, filed August 24, 2023, sought injunctive relief in connection with a disciplinary hearing against ZBT in April 2023, and a "cease and desist" order that was issued on April 25, 2023, following the hearing. [DE 1.] Plaintiffs simultaneously moved for entry of a temporary restraining order [DE 3], purportedly to "maintain the status quo" between the parties in the pendency of this action.

I held a prompt hearing on Plaintiff's request for a TRO and denied the motion on the record. I concluded that Plaintiffs failed to demonstrate irreparable harm in the

absence of immediate injunctive relief or that they lacked an adequate remedy at law justifying such an extraordinary remedy. I set a briefing schedule on the motion for a preliminary injunction. [DE 11.] The parties submitted briefs [DE 26; DE 30] and after a lengthy continuance due to a number of factors,[DE 32; DE 33; DE 34], an evidentiary hearing was held January 31, 2024. [DE 41; DE 42; DE 43; DE 45 (hearing transcript).] Following the evidentiary hearing, I requested post-hearing briefs, which have now been filed. [50; DE 51; *see* DE 41.]

Ahead of the preliminary injunction hearing, Plaintiffs moved to supplement their complaint with additional factual allegations pertaining to a second disciplinary hearing that was held in November 2023. Specifically, they sought to add a cause of action under § 1983 for alleged deprivations of Plaintiffs' constitutional rights to due process and freedom of association. [DE 37; DE 37-1.] Defendants opposed the motion, and it was ripe and pending when the parties presented argument at the evidentiary hearing. [DE 38; DE 39.] Instead of allowing a supplement to the complaint, I ordered an amended complaint be filed, and Plaintiffs filed one a few days later. [DE 44.]

Prior to the amendment, Defendants had moved to dismiss the claims on Eleventh Amendment immunity grounds. [DE 9.] Because the amendment did not moot the arguments raised in Defendants' motion to dismiss, I told the parties that I would construe the motion to apply to Plaintiffs' amended complaint. Shortly after the evidentiary hearing, I entered an Opinion and Order granting the motion to dismiss, in part. [DE 46.] In short, all the claims against Purdue were barred by Eleventh

Amendment immunity. Plaintiffs' claims against its employees in their official capacities for alleged violations of state law failed for the same reason. However, I permitted Plaintiffs to proceed on their § 1983 claims against the individual defendants in their official capacities based on alleged violations of federal law – namely, alleged deprivations of their rights under the First and Fourteenth Amendments.

## Facts

My prior order detailed the factual allegations in the amended complaint. I assume the parties' familiarity with the relevant allegations and will not reiterate them all for present purposes. [*See generally* DE 46 at 4–14.] To briefly recap, this case arises from two disciplinary proceedings against ZBT held before the Interfraternity Council's Judicial Board on April 12, 2023 and November 14, 2023. The first stemmed from a "registered function" at the frat house on the evening of January 27 and the morning of January 28, 2023. The second involved an informal get-together involving "borgs" (slang for "blackout rage gallons") on the fraternity's front lawn in mid-April 2023, during the week of the Purdue Grand Prix race.

The Alpha Alpha chapter of ZBT is part of a national organization that identifies as a historically Jewish fraternity. The individual defendants remaining in this case all work for Purdue and play roles overseeing student organizations and disciplinary matters in the University's office of Fraternity, Sorority, and Cooperative Life (FSCL) or Office of Student Rights and Responsibilities (OSRR). They include Brandon Cutler (Director of FSCL), Abigail Lynn Howard (Associate Director of FSCL and "primary

advisor" to the IFC), Jeffrey Stefanic (Director of OSRR), Margaret Reisdorf (Associate Director of OSRR), Amanda Palmer (Student Affairs Specialist, OSRR), Dr. Katherine Sermersheim (Dean of Students, to whom OSRR and FSCL offices report), and Beth McCuskey (Vice Provost for Student Life, to whom Dr. Sermersheim reports). They are all sued in their official capacities as state employees.

The pending motion, of course, rises or falls based on facts in the record – not allegations in the pleadings. Here's a summary of the evidence adduced at the hearing: initially, the parties stipulated to the authenticity of several physical exhibits, all of which have been tendered to the Court in hard copy and some of which were admitted at the evidentiary hearing.[1] [DE 40; DE 42.] Additionally, I heard testimony from three witnesses: Mr. Cutler and two members of the fraternity, Zachary Rossow and Lucas Ford. Oddly, none of the ZBT members named as plaintiffs in this action (Jason Bodzy, Ben Riggins, Kyle Link, Kiefer Earl, and Connor Falk) appeared at the hearing.

## I.     Procedural Rights Afforded to Purdue Students and Student Organizations

Because the constitutional tort claims before me involve alleged violations of various procedural protections in the course of the IFC Judicial Board's hearings, at the outset, it's important to focus on the procedural protections the University provides to its students. As previously explained, Mr. Cutler serves as an Associate Dean and Director of the University's office of Fraternity, Sorority, and Cooperative Life. He has

---

[1] I will uniformly cite to Plaintiffs' exhibits admitted at the evidentiary hearing as "Pltf. Exh. #," as these documents have not been electronically filed on the docket.

held the role for the past nine years. [DE 45 at 41.] He described his role as one of a "facilitator" who provides support for the University's student-governing boards. That's no small task. In the fall of 2023, the University boasted over 90 organizations with 6,800 members and five "governing councils," each of which has a "self-governance role." *Id.* at 41–42. Cutler estimated that he assists with transitioning around "150 presidents, council officers every single year." *Id.* at 42. To support this process, FSCL publishes a "resource manual" to assist with officer transitions. [DE 45 at 43–45; Pltf. Exh. 21.]

FSCL's website also includes a link to the Purdue University Interfraternity Council (IFC) Judicial Board bylaws. [DE 45 at 43–45; Pltf. Exh. 17–18.] The IFC Judicial Board is a student-led governing council; students on the board are members of various fraternal organizations associated with the Interfraternity Council. Board members are elected through the IFC's process, not by the University. As part of the University's "Collaborative Judicial Model," the board may adjudicate disciplinary matters pertaining to member fraternal organizations, like ZBT. [DE 45 at 46; Pltf. Exh. 22.]

While it was not at all clear to me ahead of the hearing, the parties appear to agree that IFC has not been given authority to adjudicate disciplinary matters pertaining to *individual students* who happen to be members of a fraternal organization at Purdue. Rather, as reflected in this case, the University may delegate authority to IFC to adjudicate discipline pertaining to incidents involving *fraternal organizations*, like ZBT, who are part of the Interfraternity Council. That makes some sense – the

collaborative judicial model enables students to take an active role in managing the affairs of their fraternal organizations, while reserving the University's authority over disciplinary actions against individual students who happen to belong to a fraternity. What's more, ZBT members have taken an active role in IFC – Lucas Ford, one of Plaintiffs' witnesses at the evidentiary hearing, previously served on IFC as its Director of Administration. [*See* DE 45 at 79.]

Cutler acknowledged that IFC may only take jurisdiction over matters involving the conduct of its member fraternities when granted such authority by the University, as written in IFC's bylaws. [*Id.* at 50–51; Pltf. Exh. 18 at 2–3.] As a practical matter, Cutler is involved in the IFC Judicial Board's hearings, sitting in on approximately "30 percent" of such proceedings in the past year. [DE 45 at 52–53.] In the hearing process, Cutler described his role as an "advisor," answering board members' questions and "ideally" playing "as little of a role as possible." *Id.* at 53.

Under a page on its website titled "Community Standards Board Conduct Conference," OSRR provides details about student conduct proceedings. [Pltf. Exh. 19 at 2.] Such proceedings "shall be instituted by the OSRR by the issuance of notice of charges." When a student responds to a notice of charges, he has certain procedural rights such as the right "to be informed of the names and addresses of witnesses known to OSRR." *Id.* Cutler explained that proceedings before the Community Standards Board ("CSB"), through which OSRR investigates and adjudicates student Code of Conduct violations, are wholly separate from matters that may be delegated to the IFC

Judicial Board. [DE 45 at 61–62.] Cutler acknowledged that the CSB can hear both organizational and individual cases. But he noted a key distinction between CSB investigations undertaken against an organization and those undertaken against an individual is that in organizational cases investigated by OSRR, information identifying witnesses is "redacted from the investigation reports." *Id.* at 62. It seems perfectly clear on the face of the CSB webpage that the relevant rules pertain to "student rights in conduct proceedings" – *not* rights an organization like ZBT may have in conduct proceedings. [*See* Pltf. Exh. 19 at 2.]

OSRR separately maintains a "FAQs for Witnesses" webpage. It states that witnesses may not participate in OSRR investigations anonymously, because "*the student* has a right to know the names of any witnesses in their case." [Pltf. Exh. 26 at 1 (emphasis added).] Cutler confirmed that this provision refers to procedures in individual student conduct matters. If OSRR was referring to organizational conduct matters, "it would say the *organization* has a right to know that." [DE 45 at 66 (emphasis added).] Again, these rules about knowing the names of witnesses appear to have no application in disciplinary matters against fraternal organizations taken up by the CSB, distinct from individual students who might happen to belong to one.

The University has good reason to maintain the privacy of student witnesses' names in the context of organizational disciplinary investigations. On cross-examination, Cutler explained that there are many regulations about what types of information the University can share about students outside of specific educational,

heath, and safety purposes. Chief among them is the Family and Educational Right to

Privacy Act ("FERPA"). *Id.* at 83. When students interact with OSRR and FSCL, the

offices may generate "student records," and Cutler understood that the University has

an obligation under the law to protect the students' names and any other identifying

information contained in such records. *Id.* at 83–84. In sum, the student names in the

investigation reports generated by OSRR are redacted for purposes of hearings before

the IFC Judicial Board, in part, based on the University's obligations under FERPA. *Id.*

Plaintiffs acknowledge that the University must comply with FERPA; they did not

make any suggestion at the evidentiary hearing that the witnesses' identifying

information did not fall under the ambit of the Act. [*See* Pltf. Exh. 36.]

All of that brings us back to the IFC Judicial Board bylaws. Recall that IFC is an

independent organization designed to manage the affairs of its member fraternities and

sororities. [*See* Pltf. Exh. 17 ("Welcome to the Interfraternity Council").] The University

may delegate certain disciplinary matters to its judicial body, but does so in the context

of organizational discipline only. To that end, IFC has formally adopted rules, including

various "adjudication procedures" that apply to disciplinary matters reviewed by the

student-run board. [Pltf. Exh. 18 at 2–4.] Article 7(A) provides that the student

"prosecutor" leads the prosecution of all matters before the board, and "shall . . .

[d]isclose evidence from an investigation [to] the Fraternal Judicial Board" and "[k]eep

confidential all information regarding investigations, hearings, and decisions." *Id.* at 3.

Article 8(B) of the bylaws sets forth hearing procedures. *Id.* at 3–4. It requires the "Chief

Justice" to "call the hearing to order, read the designated script, charges, and explain the procedure." *Id.* at 3. The next provision says that this "procedure generally reflects the Purdue University Community Standards Board guidelines," discussed above. *Id.*

Article 8(C) of the bylaws lays out "rules" for the proceedings. Only the prosecutor, Chief Justice, assigned Justices, clerk, Mr. Cutler (as Director of FSCL), the president of the fraternity being brought in for hearing, one undergraduate member of the fraternity, and one chapter advisor may sit in on the hearing. The president of the fraternity "speaks on behalf of his chapter"; the other member and chapter advisor may not speak, and the fraternity is not allowed to have a legal representative at the hearing. *Id.* at 3–4. The accused may submit evidence during argument, the Justices may ask questions at any time to either party, and witnesses may be called in for questioning and examined and cross-examined by each party. Prior hearings and incident reports are admissible for purposes of determining a chapter's responsibility and weighing potential sanctions. *Id.* at 4.

Article 8(E) provides that after the hearing concludes, the Justices deliberate along with "the Dean of Students Representative" (who I understand to be Mr. Cutler, in his capacity as Director of FSCL). Under a preponderance of the evidence standard, a party may be found not responsible, responsible, or the board may extend the hearing to another date. If there is a finding of responsibility, the board must present its findings and the Chief Justice issues a decision letter. If the finding of responsibility entails sanctions involving withdrawal of recognition for a member fraternity,

suspension, or "a severity exceeding two full semesters of probationary status with limitations of privileges," either in the context of a single hearing "or as a byproduct of previous sanctions," the sanctions must be approved by the Dean of Students or their designee. If the Chief Justice and the Dean of Students cannot reach a consensus on the sanctions, they present the options to the Vice Provost for Student Life or their designee for a final determination. *Id.*

Finally, Cutler testified about the Safety and Risk Management Authority ("SARMA") procedures, which govern alcohol at events hosted by IFC members like ZBT. [*See* Pltf. Exh. 37.] He explained that these rules are promulgated by a "subcommittee" of IFC that "is responsible for observing student organization . . . functions or events." [DE 45 at 84.] The rules include provisions for sober monitors and various other regulations on alcohol at registered events. The details are not important here – what matters is that the rules were drafted by a student member of the IFC's Executive Board Advisory Council, revised by the IFC President, and voted into effect by the IFC. [Pltf. Exh. 37 at 8.]

As with the IFC Judicial Board's bylaws, the SARMA procedures exist and were voted into effect entirely by IFC, acting on its own; FSCL and OSRR had nothing to do with promulgating the rules. [DE 45 at 85–86.] For example, the rules state that unregistered events may be shut down, and that fines may be imposed for failure to register functions with the SARMA subcommittee. [Pltf. Exh. 37 at 1.] Cutler confirmed that these are powers reserved to IFC: FCSL and OSRR do not have the power to "shut

down an event" or to fine a member fraternity pursuant to the SARMA procedures.
[DE 45 at 86–87.]

## II.    The April 2023 Disciplinary Hearing and Sanctions

On March 20, 2023, ZBT received a letter formally notifying the chapter of allegations of violations in connection with the incident at the frat house on January 27 and the morning of January 28, 2023. [Pltf. Exh. 2; *see* Pltf. Exh. 4 (4/12/23 hearing transcript) at 6–8 (summarizing charges).] The charges were based on three-fold violations of (1) the IFC and Panhellenic Association's Joint Policy on Social Functions Management guidelines on alcoholic beverages, (2) SARMA procedures concerning the presence of hard alcohol at registered functions, and (3) the IFC's bylaws, Article 27(E), which provide restrictions for alcoholic beverages on chapter property and at chapter events. [Pltf. Exh. 2 at 1–4.] The charges alleged that ZBT had hard alcohol at a registered function at the chapter house, failed to follow "BYOB" rules, did not check guests' IDs, hosted an unregistered "pre-game" before the function, permitted guests not on an approved guest list to enter the function, permitted attendees to exit out of a door that was not a "single check-out exit," and did not have properly trained sober monitors at an exit from the function. *Id.* The letter was signed by Alex Hardin, the IFC's VP of Administration. *Id.* at 5. The matter proceeded to a hearing before IFC's Judicial Board on April 12, 2023.

Cutler was present at the April 12 hearing. [DE 45 at 54.] He recalled speaking during the hearing (he "asked questions or asked for clarification" in a few instances)

and participated in deliberations with the board members following the hearing. *Id.* at 55. Cutler recalled that Hardin (serving as the student "prosecutor") disclosed two redacted reports compiled by OSRR staff. While the reports themselves were not sent to ZBT prior to the hearing, Cutler explained that "charge letters are sent out" laying out the nature of the charges against the fraternity [*see* Pltf. Exh. 2], and the investigation reports were available to look at in the OSRR office during normal business hours. [DE 45 at 56–57.] Cutler did not believe any other evidence was shared with the chapter prior to the hearing that would have identified who made the allegations against them and/or who were potential witnesses to the alleged events. *Id.* at 57.

Cutler recalled that during the hearing the chapter's representative asked for the identities of the witnesses who gave statements to OSRR, and Cutler told the representative that the names were redacted by OSRR for organizational investigations. [*Id.* at 67; *see* Pltf. Exh. 4 at 54.] More specifically, Plaintiffs pointed to a statement in a rough transcription of an audio recording of the hearing, in which an unidentified speaker stated, "Names, individual names will never be provided within an OSRR report because of their directive. . . . [T]here's never been a name provided in any OSRR report ever produced, to clarify." [Pltf. Exh. 4 at 54.]

Cutler confirmed he made this statement at the hearing. But he clarified that the statement was a factual accounting of the "IFC hearing process" in the context of "organizational" discipline, as opposed to conduct investigations pertaining to individual students who happen to be members of a fraternal organization on campus.

12

[DE 45 at 67–68.] In other words, it was not a suggestion that ZBT was being denied access to something to which it was entitled. It may be true, as ZBT's former president suggested at the April hearing, that "the names would help [ZBT] further prove that these allegations are false, and help verify names, and age, check-in times" relevant to the charges. But that speaks past the fact that OSRR does not reveal the names of witnesses in *organizational* conduct investigations and disciplinary proceedings.

Cutler further stated that it was rare for witnesses to be called at the hearings. In his experience assisting hundreds of hearings before IFC's Judicial Board, it was "atypical" for witnesses to be called and "[m]aybe a handful of witnesses have presented any information or been cross-examined." [DE 45 at 64.] Because there is no compulsory process available to the board or the charged party, if a witness chooses not to appear and testify, he explained, there's really nothing the board can do about it. *Id.* While OSRR redacted identifying information from the reports admitted as evidence at the hearing, in his experience "many of the individuals that are witnesses are known to the Chapter as well" because the underlying incidents involve students familiar with each other. *Id.*

Even though OSRR does not reveal the names of witnesses, Cutler noted that nothing prevents the charged organizations calling their own witnesses. *Id.* at 64, 80–81. For example, if the chapter had wished to challenge allegations that they violated a conduct rule involving a gathering at the chapter house, they would be free to call house residents who were present. No limit is placed on the number of witnesses who

can be called. *Id.* at 81. What's more, IFC requires hosts of registered functions to maintain a "guest list," which is "maintained by the chapter" ahead of the hearing, and which provides all the names of individuals present at the event. *Id.* at 81–82. But, in this case, neither the board nor ZBT called any witnesses. Instead, the prosecutor simply presented the OSRR report and information from "call-ins" to investigators, but did not have any physical evidence (*e.g.*, photos) from the incident. [*See* Pltf. Exh. 4 at 39.]

Zachary Rossow, a former member of ZBT's executive board, was present at the April 12 hearing as one of the chapter's representatives. [DE 45 at 107.] He recalled that the student prosecutor read the OSRR investigation report into the record; but he would not "really classify that as evidence" against the chapter. *Id.* at 110. He noted that none of the ZBT members were interviewed as part of OSRR's investigation. *Id.* at 111. The "so-called evidence" against the chapter consisted of information OSRR compiled from student-interviewees "that were supposedly there [at the event], but all names were redacted." In Rossow's view, because there was no photographic evidence of the violations taking place, and all the witnesses' names were redacted from the report, there was no evidence supporting the charges. He recalled that the chapter tried to ascertain the identities of the witnesses, including by asking OSRR to disclose them, but its requests were denied.

Rossow also quibbled with reports from SARMA observers present at the function, and how this evidence was presented at the April 12 hearing. [DE 45 at 115–17.] He understood that there were two SARMA inspections that took place during

14

the event, and both inspections "came back clean with zero first-degree violations and zero second-degree violations," meaning there was no hard alcohol and BYOB rules were being maintained. *Id.* at 116. Rossow later reviewed the SARMA reports and found they had been "altered" to reflect first- and second-degree violations had been discovered. *Id.* at 116–17. This, he suggested, was proof positive that the fix was in.

This supposed "SARMA report" switcheroo was far from a Perry Mason moment. The rough transcription of the evidentiary hearing undermines the notion that the final reports were surreptitiously changed based on sketchy information or animus against ZBT. [*See* Pltf. Exh. 4 at 82–86.] ZBT's representatives raised the specter of why "over a day later, the SARMA reports were changed." In response, the IFC Judicial Board called its Vice President of Risk Management, a student named Leo Dagon, to get to the bottom of it. *Id.* at 84–85. Dagon explained that the original reports had "missed" information that he had personally observed, and that OSRR had documented in speaking with witnesses at the event; the changes were made because Dagon later received information that the SARMA observers missed because they were only at the event for around 20 minutes. *See id.* at 89–90.

It's really not clear at all from the record of the hearing what effect, if any, these reports had on the board's deliberations. Earlier in the proceedings, the student prosecutor noted that the charges were essentially based on the "OSRR report and call-ins," which reflected statements "from people who were at the OSRR . . . under the condition to tell the truth," while conceding that there was no "picture evidence." *Id.* at

39 ("[A]ll we have for you are these statements given to us by the [OSRR]."). At bottom, it's clear the board did not casually discard the apparent discrepancy in the SARMA reports; rather, the issue was aired, further investigated, and apparently made little difference in the calculus.

A related issue is the apparent "delay" in ZBT receiving a copy of the audio recording from the hearing. [DE 45 at 76–78.] The day after the hearing, Cutler emailed ZBT and the IFC Judicial Board members about the process for requesting hearing records, directing ZBT to make a public records request through Purdue's legal counsel. [Pltf. Exh. 6.] Plaintiffs' counsel made a formal records request April 24, 2023. [Pltf. Exh. 9.] Many months went by with no response. In September 2023, Plaintiffs' counsel followed up with Purdue's counsel, who confirmed that there was a recording available but that it was not a "public record" under Indiana law. [Pltf. Exh. 10–12.] Rather, the record belonged to IFC, so ZBT needed to make a request from Hardin, IFC's representative for such matters. Cutler acknowledged that he was mistaken and in hindsight, he would have directed ZBT's representative to ask Hardin for a copy of the recording. [DE 45 at 77.] By all accounts, this delay seems to be the result of an honest mistake and not a nefarious attempt to block ZBT from having a record of the hearing.

On April 13, 2023, ZBT received a letter with IFC's "determination" of violations. [Pltf. Exh. 5.] The board found ZBT "responsible" for seven of the charged violations and "not responsible" for five of the charges. *Id.* at 1–3. The chapter was fined $4,500 for endangerment, alcohol, and unregistered function violations and placed on "limited

social probation" until November 1, 2023. *Id.* at 3. This probation limited ZBT to four

registered functions, only one of which could take place during the week of the Purdue

Grand Prix. *Id.* After November 1, the organization would be placed on "organizational

probation" through December 31, 2023. *Id.* Whatever one may think of the sanctions

imposed, the mixed nature of the board's findings—finding ZBT not responsible for five

of twelve charges—stands in contrast with ZBT's assertions that the process was

somehow rigged against it.

Because of the aforementioned delay, ZBT did not have a copy of the hearing

recording to use in its appeal, which it filed April 21, 2023. [*See* Pltf. Exh. 7.] The appeal

was denied in an April 24 letter from Noah Berning, IFC's President, who noted the

decision was "final and cannot be appealed further." All of the sanctions remained in

place, although by their terms they have since expired. [*See* Pltf. Exh. 5; Pltf. Exh. 8.]

### III.    The November 2023 Disciplinary Hearing and Sanctions

One might reasonably think that ZBT members would be on their best behavior

following the IFC hearing and the denial of their appeal.  Instead, some members

thought it a good idea to have party on the front lawn of the frat house. A video sent to

IFC showed several frat members with "borgs" (shorthand for "blackout rage gallon")

accompanied by some red solo cups. As it was explained to me at the hearing, a "borg"

is a gallon jug where some of that water is emptied out and filled back in with some sort

of hard alcohol, commonly vodka, and then mixed with a sweetener. Receipt of the

video prompted Berning to send a second letter to ZBT on April 25, 2023, directing the

chapter to "place all chapter social events and activities on immediate cease and desist."
[Pltf. Exh. 13.] Based on the "risk management incident" (meaning the presence of the
borgs), IFC "decided to take action to mitigate any future incidents" by directing ZBT to
indefinitely suspend any chapter social events or events involving alcohol. Chapter
operations, such as executive board and chapter meetings, new member activities and
recruitment, and intramurals could proceed; but a chapter advisor had to be present at
all new member activities and recruitment, and such meetings had to be approved by
the IFC Executive Committee.

On August 28, 2023, ZBT received a second "official notification" of alleged
violations in connection with this separate incident. [Pltf. Exh. 14.] This new set of
charges involved violations of rules about alcohol and failure to register a function at
the chapter house. *Id.* at 1–2. On September 8, ZBT received a second letter from IFC
directing the chapter to immediately suspend all new member events unless a
representative from ZBT's national organization was present. [Pltf. Exh. 15.] Following
an investigation, there would be a hearing to determine the chapter's ongoing status at
the University. In October, this additional restriction was lifted. [Pltf. Exh. 16.]

A hearing was held November 14, 2023. [Pltf. Exh. 35 (11/14/23 hearing
transcript).] Lucas Ford appeared at the hearing as one of ZBT's representatives. [DE 45
at 159.] He recalled that like the first hearing, Cutler was also present and Hardin
served as the student prosecutor. *Id.* The prosecution relied on videos and a photo of
individuals assembled outside the chapter house on the spring day in question. [Pltf.

Exh. 35 at 4.] Hardin told the board that the photo depicted non-member guests on the front lawn "as well as some cans." *Id.* at 8. The video evidence similarly showed people congregated on the front lawn and deck area. *Id.* at 9. Another video reflected someone "going down a pipe on the hill" with people watching him fall off. *Id.* Hardin then referred to evidence of up to seven "borgs" presumably containing hard alcohol being seen onsite. *Id.* Unlike the first hearing, there was no OSRR report introduced into evidence. No firsthand witnesses were called to corroborate the conclusions the prosecutor drew from his review of the videos and photograph.

Ford took issue with the fact that ZBT did not know "where the photos and video came from," noting that IFC had denied its request to produce names of the individuals who turned over this evidence. [DE 45 at 160.] I was confused by this at the evidentiary hearing, as it was unclear to me how the identities of the videographers was "germane to anything." *Id.* at 161. Ford indicated that the value of the witnesses' identities was impeachment – so that the fraternity could cross-examine them as to the authenticity of the recordings. *Id.* at 161–62. Although Ford suggested that Hardin's conclusions about what the videos depicted were baseless and conclusory, since no firsthand witnesses appeared to back them up, *see id.* at 164, he also readily admitted "there were definitely a number of gallon jugs" depicted in the videos, and did not "have any idea of why they wouldn't be borgs," based on his experience as a member of ZBT, while insisting that "the pictures did not depict that they were borgs." *Id.* at 167.

Asked what the use of the gallon jugs would be for, if not a borg, Ford was at a loss. *Id.* at 168.

Ford further conceded that there was "hard evidence," like statements from witnesses known to the fraternity, that ZBT could have presented in its defense. [DE 45 at 175.] But he expressed that the fraternity did not "think we would have been taken seriously," and so decided not to submit any such evidence. *Id.* While Ford "wasn't there" when the event took place, he acknowledged that ZBT could have submitted testimony "from brothers" present, but he did not "think that . . . would have been taken seriously by the IFC." *Id.* at 176–77; *see id.* at 183 ("[I]t would be a waste of time because they wouldn't believe us.").

Later in the hearing, Hardin discussed potential sanctions. [Pltf. Exh. 35 at 30.] He noted that this was the latest incident in a string of disciplinary matters involving ZBT (and, notably, alcohol), including a hearing in November 2021, an administrative review in 2022, and the hearing in April 2023. *Id.* He pointed out that this event occurred "three days after the last judicial hearing," and "that seems kind of like a middle finger to the process, to [IFC], to the judicial board." *Id.* at 32–33.

The following day, IFC issued findings of responsibility on all four charges. [Pltf. Exh. 29 at 1–2.] ZBT was placed on "deferred suspension" until December 31, 2024. *Id.* at 2. This meant that there could be no alcohol at the chapter house. IFC also listed a slate of probationary sanctions. Until the end of 2023, the chapter was placed on "full social probation," meaning it could not host any events. From December 31, 2023 to

February 14, 2024, ZBT was under "limited social probation," and could registered only one function after meeting with IFC's VP of Risk Management. The limited social probation would continue from February to May 2024, during which time the chapter could have three registered functions. From May 12, 2024, through the end of the year, the chapter would be on limited social probation and permitted to host five registered functions. A term of "organizational probation" would then be imposed from December 31, 2024 through May 11, 2025. Finally, IFC required the development of an alcohol compliance plan and hosting an education event on "drinking smart" culture, plus a $1,000 fine for the alcohol violations. *Id.* at 2–3. Later that month, Dr. Katherine Sermersheim affirmed the recommended sanctions. [Pltf. Exh. 30.] ZBT appealed the final decision, but the appeal was denied on December 14, 2023. [Pltf. Exh. 31–33.]

## IV.    The Impact of Existing Sanctions on ZBT

Unlike the first set of sanctions, which expired at the end of 2023, the discipline arising from the second incident is ongoing. Rossow and Ford provided testimony on the impact the sanctions have on the chapter. They conveyed that under the sanctions still in place, the chapter must obtain permission to host social and philanthropic events (which sometimes dovetail with social events). [DE 45 at 98, 103–05, 152.] While both acknowledged that IFC had not barred the fraternity from associating completely, and the chapter was able to engage in recruitment activities and host events with supervision, Rossow suggested that "morale is going down because [ZBT's] recruitment is getting lower," and noted that "social events are a lot of things that drive the bonds of

21

our fraternity." *See id.* at 105–06. He suggested that chapter members feel that they are

unable to "do acts of service" and continue building relationships in the community

through outreach events and other philanthropic endeavors. *Id.* at 121. Ford noted that

"big, whole-house events . . . are the main opportunity for us as such a large chapter to

really develop those bonds of brotherhood between people," and that it can be hard to

make bonds "when you are such a large chapter." *Id.* at 152. "Granting this preliminary

injunction will help [ZBT] get back to a level of strong brotherhood in the house" – but

even more importantly, Ford suggested, it would "set a precedent for the way that

these hearings are being held at Purdue." *Id.* at 156–57.

However, ZBT's witnesses conceded that the sanctions do not prevent the

fraternity from hosting "impromptu gatherings of members, their girlfriends, and

closest friends on a lawn patio" and such events do not inherently "convert the

situation into a social event that must be registered." [DE 45 at 179; *see* Pltf. Exh. 31.] If

there is no alcohol present on the property, IFC policies do not require the chapter to

"register guests and the gathering is not a function" under its rules. [DE 45 at 179–80;

Pltf. Exh. 31.] When ZBT requested clarification of the rules to host a philanthropic

event, IFC confirmed that philanthropy is distinct from a sanctioned social event.

[DE 45 at 180–81.] While Plaintiffs contend that any and all social activity is subject to

further discipline while the sanctions remain in place, the evidence simply does not

support such a conclusion. To the contrary, all involved seem to understand that the

key factor that is cause for concern is the presence of alcohol at social gatherings. The

record reflects that, at least in the eyes of IFC—a student-run organization ZBT has joined and actively engaged in voluntarily—ZBT has casually disregarded policies pertaining to the presence of alcohol at its events, and that the sanctions are necessary to root out that pervasive issue.

Finally, while Plaintiffs put on evidence that their community outreach initiatives were hampered by the existing sanctions, there is strong evidence that suggests otherwise. FSCL compiles a report each semester reflecting organizations' academic performance, recruitment numbers, community service, philanthropy dollars, and compliance with policies. [DE 45 at 190.] A draft of the fall semester 2023 report reflects that ZBT members totaled some 2,233 service hours – placing it in the upper echelon of fraternities in terms of time spent on community outreach and the like. [DE 43-1 at 5–6.] The fraternity also gained forty new members, for a total of 159 members – again, putting it among the leaders in headcount and new recruits that joined during the period. *Id.*

With this exhausting factual background in mind, I'll now turn to the substance of the claims and evaluate whether Plaintiffs have made the required showing that they are entitled to the preliminary injunctive relief they seek.

## Discussion

Plaintiffs seek a preliminary injunction preventing Defendants from enforcing the sanctions imposed after the April and November 2023 hearings, requiring "any disciplinary hearing" involving ZBT to include certain procedural safeguards (like

access to evidence, identification of witnesses, and the right to have legal counsel during disciplinary hearings before the IFC Judicial Board), requiring Defendants to remove the decision and sanctions imposed from the fraternity's disciplinary records, and requiring Defendants to provide them with a copy of the April 12 hearing recording. [*See* DE 46 at 14.] The first set of sanctions has expired and Plaintiffs have received a copy of the hearing recording, so those aspects of the dispute have been rendered moot. Plaintiffs have two theories that they say entitle them to a preliminary injunction: (1) a violation of their First Amendment rights to the freedom of association; and (2) a Fourteenth Amendment due process claim.[2]

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To obtain a preliminary injunction, the moving party must show that (1) he will suffer irreparable harm before the final resolution of his claims; (2) available remedies at law are inadequate; and (3) he has a likelihood of success on the merits. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 323–24 (7th Cir. 2015); *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015). If a moving party makes this showing, the court "weighs the competing harms to the parties if an injunction is granted or denied," "considers the public interest," and employs a "sliding-scale analysis," under which "the greater the likelihood of success

---

[2] Plaintiffs also mention the right to equal protection in their complaint, but that theory wasn't discussed at the hearing nor in Plaintiffs' post-hearing brief. [*See* DE 50.] So any theory under the Equal Protection Clause was waived, at least for purposes of preliminary relief.

on the merits, the less heavily the balance of harms must tip in the moving party's

favor." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013).

Plaintiffs have failed to demonstrate the threshold requirements for preliminary

injunctive relief. For starters, for there to be a likelihood of success on the merits, "the

applicant need not show that [he] definitely will win the case." *Ill. Republican Party v.*

*Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not

enough." *Id.* at 762 (citing *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22

(2008)). "A 'strong' showing . . . normally includes a demonstration of how the

applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks

omitted). At this stage, I do not simply "accept [the plaintiff's] allegations as true" or

"give him the benefit of all reasonable inferences in his favor, as would be the case in

evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784,

791 (7th Cir. 2022). Instead, I must make an assessment of the merits as "they are likely

to be decided after more complete discovery and litigation." *Id.*

The Constitution protects two forms of free association.  The first, freedom of

expressive association, arises from the First Amendment and ensures the right to

associate for the purpose of engaging in activities protected by the First Amendment.

*See Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984); *Klug v. Chicago Sch. Reform*

*Bd. of Trustees*, 197 F.3d 853, 857 (7th Cir. 1999). The second, freedom of intimate

association, protects the right "to enter into and maintain certain intimate human

relationships." *Roberts*, 468 U.S. at 617. Because the freedom of intimate association

involves a fundamental element of "personal liberty," *id.* at 618, it is "protected by the due process clauses." *See Montgomery v. Stefaniak*, 410 F.3d 933, 937 (7th Cir. 2005) (collecting cases); *Swank v. Smart*, 898 F.2d 1247, 1251–52 (7th Cir. 1990).

As noted in my prior order, the operative complaint is a little unclear, but it appears that the sum and substance of Plaintiffs' claim is that the individual defendants acting in their official capacities as state employees burdened their First Amendment right to freely associate, without affording them due process of law.[3] In other words, it appears that Plaintiffs raise the second form of freedom of association claim by telling me that their "associational rights are constitutionally protected liberty interests." [DE 50 at 5.] *See also* [DE 44, ¶¶ 73, 110, 187; *see* DE 3 at 17; DE 45 at 27 (stating that Plaintiffs are asking the court to determine "whether First Amendment rights have been improperly infringed upon without due process"); DE 50 at 14 (asserting that if the sanctions are allowed to remain in effect, students "will be deprived of the opportunity to be part of an unrestricted fraternal experience as a member of Zeta Beta Tau").]

The Fourteenth Amendment prevents states from depriving a person of property or liberty without due process of law. U.S. Const. amend. XIV, § 1. To make out a due process claim, it is first necessary to identify a protected property or liberty interest

---

[3] Plaintiffs at one point in this case suggested that they face loss of recognition as a student organization as a result of the disciplinary proceedings before the IFC Judicial Board. They do not make this argument in their post-hearing brief [*see* DE 50], and I assume they have abandoned the argument that Defendants infringed on their First Amendment rights through loss of recognition as a registered student organization. In any case, the record reflects that this line of argument has no basis in fact – as it stands, the fraternity has not lost recognition as a result of the sanctions. The possibility that further disciplinary actions may eventually cause a loss of recognition as a student organization is wholly speculative and does not form a basis to grant Plaintiffs' requested relief.

protected by the Fourteenth Amendment; then, if such an interest has been deprived, I must evaluate what process was due under the circumstances. *See Malhotra v. Univ. of Ill. at Urbana-Champaign*, 77 F.4th 532, 536 (7th Cir. 2023) (citing *Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013)).

At the outset, it needs to be pointed out that none of the individual plaintiffs testified about the claimed burdens on their ability to freely associate as members of the fraternity – indeed, they didn't testify at all. Assuming without deciding that ZBT (as opposed to its individual members) has associational standing to assert a claim for deprivation of its members' associational rights, there is scant basis to conclude that the two disciplinary proceedings previously outlined resulted in a deprivation of anybody's First Amendment rights. The testimony adduced at the evidentiary hearing shows that the discipline imposed does not prevent the fraternity from engaging in philanthropic endeavors and community outreach. Rather, for certain types of events (particularly those involving the presence of alcohol or individuals not affiliated with the fraternity), ZBT must obtain approval from IFC, a student-run organization with which the fraternity voluntarily associates (and its members have, in the past, taken an active role leading). There is hard data to back up the inference—entirely reasonable on the face of the testimony itself—that ZBT is able to actively recruit new members, engage in philanthropic activities, and contribute community service hours, despite the sanctions in place.

Plaintiffs at one point in the evidentiary hearing suggested that they would be prevented from participating in a march in Washington, D.C. [*See* DE 45 at 27.] This assertion is simply not supported by any evidence. The same is true of concerns expressed by Rossow and Ford that the chapter cannot engage in any alcohol-free social gatherings without fear of reprisal. To the contrary, the chapter is free to inquire with IFC about the scope of the discipline imposed; and any reasonable person reading IFC's communications about the sanctions imposed would find these fears to be little more than empty rhetoric. More is needed to demonstrate a concrete First Amendment burden. *See Speech First, Inc. v. Killeen*, 968 F.3d 628, 638–39 (7th Cir. 2020) (explaining that a plaintiff must make "particularized" showing of either: (i) an intention to engage in a course of conduct arguably affected by a policy, coupled with a credible threat that the policy will be enforced against the plaintiff; or (ii) a chilling effect on the plaintiff's speech that is objectively reasonable that causes the plaintiff to self-censor as a result). Appeals to phantom burdens on "free association" do not make out a claim for deprivation of Plaintiffs' First Amendment rights, let alone reflect a strong likelihood of success on such a claim.

But let's presume for the moment that Plaintiffs made a strong showing that their associational rights were deprived. I'm not sure where it gets them. There is little evidence that the process afforded in the course of the two disciplinary hearings was wanting under the circumstances. Plaintiffs have sued multiple Purdue officials; but the only person who seems to have had anything to do with the process meted out was Mr.

28

Cutler. There is no suggestion that he did anything in the course of the two hearings to deprive Plaintiffs of a fair hearing. The evidence showed that he was present at the hearings as an advisor to the board. After ZBT representatives voiced concern over their inability to ascertain the identities of witnesses who ratted them out to OSRR during the April 12 hearing, Cutler provided clarity on the procedure by which OSRR redacts witnesses' information. He testified that the process is more extensive for individual conduct cases, which strikes me as an entirely commonsense approach. Plaintiffs have thoroughly confused the rights afforded to individual students in misconduct proceedings (matters in which students may face suspension or even expulsion from the University) with those afforded to fraternal organizations under rules that IFC—*not* the University itself—has adopted to manage the affairs of its member chapters. In short, there is no evidence that anything the named defendants did in their roles as University officials had the effect of depriving Plaintiffs of procedural protections that they were owed under the circumstances. There has been no showing that under the relevant procedures in place, the process afforded to Plaintiffs was wanting due to any of the named defendants' actions or omissions.

In that vein, it's also important to note that Plaintiffs' witnesses, specifically Mr. Ford, acknowledged that ZBT was free to call witnesses in its defense and simply chose not to. The fact that ZBT (somewhat cynically) viewed the hearing as rigged and failed to present a defense to the alleged infractions does not support a likelihood of success on the merits of Plaintiffs' claim that Defendants deprived them of due process. It may

be that IFC had an ax to grind with the chapter; but a closer review reflects that the evidence presented at the hearings was far from threadbare, ZBT took the opportunity to challenge the sufficiency of the evidence against the chapter, and the fraternity did not put on any evidence in its own defense.

For all their arguments about the apparent defects in the IFC's procedures, the fact remains that the vast majority of the cited procedures find no application in the context of organizational disciplinary matters delegated to IFC. It is really of no moment that the University may afford greater procedural protections in individual conduct cases, and authorities that speak to that distinct context are inapposite. [*See* DE 50 at 7 (citing *Doe v. Trustees of Indiana University*, 496 F. Supp. 3d 1210 (S.D. Ind. 2020) (granting dismissal of plaintiff's suit based on suspension imposed following disciplinary proceeding concerning allegations of sexual misconduct against non-student minor).] Moreover, the record of both hearings indicates that a great deal of effort was made to afford ZBT the chance to be heard and present its defense to the charges. The assertion that the sanctions imposed were "arbitrary" really has no foundation in the record before me, and certainly does not suffice to make out a strong showing of likelihood on the merits. [*Contra* DE 50 at 12.]

For similar reasons, Plaintiffs fail to demonstrate irreparable harm in the absence of preliminary injunctive relief. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff

is entitled to such relief." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22

(2008) (citing *Mazurek*, 520 U.S. at 972). As to their fear of a loss of recognition as a

student organization at Purdue, that's all Plaintiffs have demonstrated: the *possibility* of

harm. That's not enough. The "ongoing" harms Plaintiffs assert as a result of the two

disciplinary proceedings [*see* DE 50 at 12] simply overstate their case. There is no

evidence that ZBT and its members cannot engage in expressive activities; the sanctions

do not speak whatsoever to free expression. Activities involving alcohol may require

oversight from IFC – but this is precisely the type of oversight that the chapter

voluntarily assented to by joining the student-run organization.

Moreover, to the extent ZBT believes that its ability to recruit new members and

engage in community outreach have been irreparably harmed in the aftermath of the

sanctions, there is strong evidence that belies this notion. As of fall 2023, recruitment

was alive and well and the chapter was among the University's leaders in community

service hours contributed. The notion that "morale" is low because the chapter cannot

host a party with alcohol and speculation that recruitment, philanthropy, and

community service activities are hampered under the sanctions are a far cry from a

showing of irreparable harm if the sanctions are allowed to remain in effect (as they

have been in some form for over a year).

Because Plaintiffs have failed to make out threshold requirements to obtain

injunctive relief, I need not proceed to consider the "balancing phase" of the analysis.

*See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079,

1085–86 (7th Cir. 2008), *abrogated on other grounds by Nken v. Holder*, 556 U.S. 418, 434 (2009). *See also Anderson v. Jeanpierre*, No. 23-1807, 2024 WL 1478029, at *3 (7th Cir. Apr. 5, 2024) ("Because Anderson cannot show a likelihood of success on the merits, we need not address the other prerequisites to obtain a preliminary injunction.").

*        *        *

In sum, the record before me fails to demonstrate a strong likelihood of success on the merits of Plaintiffs' claims under the First and Fourteenth Amendments, and there is no basis to conclude that Plaintiffs will suffer irreparable harm in the absence of preliminary injunctive relief. For these reasons, Plaintiffs' motion for a preliminary injunction [DE 3] is **DENIED**.

**SO ORDERED**.

ENTERED: May 15, 2024.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT